1  Steven Zelig, SBN 094654
2  BAY CITIES LAW GROUP, INC.
3  1046 Princeton Drive #201
   Marina del Rey, California 90292
4  T: 310/393-6702 F: 310/393-6703
   Attorney for Plaintiffs

**Electronically FILED by
Superior Court of California,
County of Los Angeles
1/16/2024 3:22 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Tarasyuk, Deputy Clerk**

5

6              SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                        COUNTY OF LOS ANGELES

8

9  238 SERRANO PROPERTIES LLC;               Case No.: 24STCV01214
10 414 PALM DRIVE LLC;
   616 SWEETZER VILLAS LLC;
11 1546 CAMDEN VILLAS LLC;
   CHANNEL ISLAND VILLAS LP;                 COMPLAINT FOR DAMAGES,
12 CHATEAU CATALINA LLC;                     ATTORNEY FEES AND COSTS,
   HAVENHURST HABITATS LLC;                  DECLARATORY RELIEF AND
13 HOLLYWOOD CARLTON PROPERTIES, LLC;        INJUNCTIVE RELIEF
14 MEHTA SISTERS LLC;
   NEWHALL APARTMENTS LLC;
15 NVS PROPERTIES LLC;
   PARALLAX PROPERTIES LLC;
16 PIEDMONT VILLAS LLC;
   PLUTO INVESTMENT PROPERTIES LLC;
17 SILVER POINT PROPERTIES LLC;
   STREAMLINE PROPERTIES LLC;
18 THAMES PROPERTIES LLC;
19 VIRGIL VILLAS LLC;
   VSN PROPERTIES LLC; and,
20 XENON INVESTMENT CORP.,

21
   Plaintiffs,
22
                      vs.
23

24
   THE STATE OF CALIFORNIA, a governmental entity;
25 THE COUNTY OF LOS ANGELES, a governmental
   entity;
26 THE CITY OF LOS ANGELES, a governmental entity;
27 CITY OF BEVERLY HILLS, a governmental entity;
   CITY OF WEST HOLLYWOOD, a governmental entity;
28

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND
INJUNCTIVE RELIEF
i

1  CITY OF GLENDALE, a governmental entity;
2  CITY OF GOLETA, a governmental entity;
   CITY OF OXNARD, a governmental entity;
3  THE COUNTY OF VENTURA, a governmental entity;
   THE COUNTY OF SANTA BARBARA, a governmental
4  entity;
   and, DOES 1 through 400, inclusive,
5
6  Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

PART ONE:     OVERVIEW AND COMMON FACTS............................................................ 1

    A.        Introduction. ............................................................... 1

    B.        Venue ....................................................................... 4

    C.        The Plaintiffs. ............................................................ 4

    D.        Does........................................................................... 6

    E.        Defendants................................................................. 6

    F.        Agency, Conspiracy, and Aiding and Abetting............................................ 7

    G.        Chronology............................................................... 7

    H.        The fallacies and realities. ......................................... 21

    I.        Plaintiffs seek compensation and other orders. ........................ 23

First Cause of Action –  Inverse Condemnation/Uncompensated  Physical Taking in Violation of The Fifth Amendment of The United States Constitution .......................................... 25

Second Cause of Action –  Inverse Condemnation/Uncompensated Regulatory Taking in Violation of the Fifth Amendment of the United States Constitution ........................... 29

Third Cause of Action –  Inverse Condemnation/Uncompensated Physical and Regulatory Taking in Violation of the Fifth Amendment of the United States Constitution......................... 32

Fourth Cause of Action –  Inverse Condemnation/Uncompensated Taking in Violation of Article I, Section 19 of the California Constitution ................................................. 33

Fifth Cause of Action –  Federal Statutory Claim (42 USC 1983)................................. 34

Sixth Cause of Action –  Federal and State Constitutional Claim (Impairment of Contracts)..... 35

DEMAND FOR JURY TRIAL ................................................................. 39

\*\*\*

"…[I]ndividual rights secured by the Constitution do *not* disappear during a public health crisis." ( <u>In re Abbot</u> (5th Cir. 2020) 954 F.3d 772, 784.)

\*\*\*

*The purpose of the Takings Clause is to "bar government from forcing some people alone to bear the public burdens, which, in all fairness and justice should be borne by the public as a whole."* (<u>Lingle v. Chevron</u> (2008) 544 U.S. 528, 537, quoting <u>Armstrong v. United States</u> (1960) 364 U.S. 40, 49)

\*\*\*

Plaintiffs, listed in the caption of this pleading, hereby allege:

**PART ONE:  OVERVIEW AND COMMON FACTS.**

**A.    Introduction.**

1.    Plaintiffs are owners and lessors of residential apartment houses and complexes, situated in the City of Los Angeles, the City of West Hollywood, the City of Beverly Hills, the City of Goleta, the City of Oxnard, the County of Los Angeles, the County of Ventura, the County of Santa Barbara and the State of California. Plaintiffs were, and continue to be effectively "singled out" to shoulder and subsidize burdens and issues caused by the COVID-19 Pandemic ("**Covid**" or **"the Pandemic"**) that rightfully should be borne by the public and society at large. In effect, Plaintiffs' properties have been unlawfully and illegally "taken" without compensation, just or otherwise. *All Plaintiffs have suffered substantial and continuing economic losses and hardships as a direct result of various forms of imbalanced orders, resolutions, ordinances, eviction moratoria (**Eviction Moratoria**) and related government mandates, hereinafter collectively referred to as "**the Government Orders.**"*

2.    Plaintiffs seek redress for deprivation of rights, privileges and immunities secured by: (a) the Fifth and Fourteenth Amendments to, and Art. 1, Section 10 of, the United States Constitution; (b) Sections 1983, 1985 and 1988 of Title 42 of the United States Code; and, (c) The Constitution of the State of California (including Article I, Section 9) and other applicable laws and provisions.

3.    Without regard for the rights of Plaintiffs, Defendants instituted a series of

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1

orders, resolutions, ordinances and related governmental mandates, which among other things: (a) created moratoriums on evictions; and, (b) prohibited lessors and landlords, such as Plaintiffs, from asserting contractual remedies and exercising their constitutional rights to access to the courts in instances where tenants refused to pay rent and asserted they were impacted by the Pandemic; and, (c) severely reduced the amounts Plaintiffs could charge for rent, and other forms of revenue. The Government Orders, including the Eviction Moratoria in particular, are illegal, imbalanced, and significantly infringed on, and continue to infringe on, Plaintiffs' rights (constitutional, civil and/or otherwise); and have caused direct and substantial economic losses to all Plaintiffs.

4.      As detailed below, the Government Orders unlawfully, disparately, and unequally impact and single out landlords and property owners, such as Plaintiffs to shoulder the burdens that rightfully should be absorbed by society at large. In implementing and imposing the Government Orders:

a.      Defendants violated Plaintiffs' United States and State Constitutional rights, and "took" (regulatory, physical and/or otherwise) Plaintiffs' properties without provision of just compensation;

b.      Defendants impaired contracts in violation the United States Constitution;

c.      Defendants violated Plaintiffs' rights to due process;

d.      Defendants nullified Plaintiffs' constitutional rights to access to the courts.

e.      Defendants directly caused Plaintiffs' substantial and continuing economic losses.

f.      In various other ways, according to proof.

5.      As a direct result of the Government Orders, *Plaintiffs, as owners, landlords and/or lessors of residential apartment houses and complexes are the **only** sector of business, industry, profession or commerce which has been ordered, by way of illegal, unequal and imbalanced governmental action, to subsidize economic issues and absorb economic burdens created by the Pandemic that should be rightfully be borne by society and the public at large*.

6.      By way of example, to place the imbalance, inequity and inequality into perspective:

a.      Defendants did *not order grocery stores* to give its patrons "credit" upon a showing (with or without supporting documentation) of economic hardship created or linked to

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

2

the Pandemic.

b. Defendants did *not order gas stations* to slash gas prices by 100% in exchange for an "I.O.U." promising payment in the future.

c. Many other examples too numerous to list.

7. As a direct result of the implementation of the Government Orders including Eviction Moratoria, and other conduct of Defendants according to proof, Plaintiffs suffered damages as a result of the following:

a. Many of Plaintiffs' tenants stopped paying rent.

b. Many of Plaintiffs' tenants who were legitimately impacted by the Pandemic submitted notices or affidavits to the effect that they were impacted by Covid (**Covid Notices**), thereby prohibiting Plaintiffs per the Government Orders from pursuing evictions and other remedies. The Government Orders and Eviction Moratoria were so pro-tenant and so anti-landlord that the landlords, including Plaintiffs could not even challenge the legitimacy of the Covid Notices, and if they did they could be subject to substantial penalties and monetary losses.

c. Plaintiffs are informed and believe that some of Plaintiffs' tenants submitted Covid Notices even though they were not legitimately impacted by Covid, but again, due to the Government Orders, Plaintiffs were left without remedies, effective or otherwise.

d. The number of tenants who were subject to eviction sky-rocketed as a direct result of the Government Orders.

e. Plaintiffs are informed and legitimately believe that some of their tenants simply failed to pay rent because they understood that landlords such as Plaintiffs were very apprehensive and cautious about pursuing evictions based upon convoluted, ambiguous and seemingly inconsistent language in the various Government Orders and Eviction Moratoria. More specifically, at best, the Government Orders and Eviction Moratoria of the various Defendants were confusing and ambiguous, and contradicted and were inconsistent with each other in many ways. Even among knowledgeable landlords, property managers, lawyers, and even judges, there was no consensus relative to

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

3

interpretating and harmonizing the Government Orders and Eviction Moratoria. This left landlords, such as Plaintiffs, completely "in the dark" as to how to proceed, and concerned about statutory, legal and even criminal penalties linked to any improper eviction activity. As a direct result of the ambiguities and inconsistencies between the competing Government Orders including Eviction Moratoria, landlords, such as Plaintiffs, were fearful of pursuing evictions, which evictions would not have been necessary in the first place **but for** the Government Orders.

f.    The costs and difficulties of, and legal risks related to pursuing evictions substantially increased.

g.    Other problematic issues directly related to, and caused by, the Government Orders.

**B.    Venue**

8.    Most of the effected properties are located in Los Angeles County, and accordingly venue is proper. The other properties are located in Ventura County and San Bernardino County. Venue is proper as to these entities because common issues of novel law and fact.

**C.    The Plaintiffs.**

9.    Plaintiffs are various forms of entities recognized under California law.  Each of the properties owned and operated by Plaintiffs located in Los Angeles County, Ventura County and Santa Barbara County negatively impacted by the Government Orders are as follows:

a.    238 Serrano Properties LLC owns and operates an apartment building located at 238 S. Serrano Avenue, Los Angeles, CA 90004.

b.    414 Palm Drive LLC owns and operates an apartment building located at 414 N. Palm Drive, Beverly Hills, CA 90210.

c.    616 Sweetzer Villas LLC owns and operates an apartment building located at 616 North Sweetzer Avenue, Los Angeles, CA 90048.

d.    1546 Camden Villas LLC owns and operates an apartment building located at 1546 Camden Avenue, Los Angeles, CA 90025;

e.    Channel Island Villas LP owns and operates an apartment building located at 4200

Harbor Avenue, Oxnard, CA 93035;

f.    Chateau Catalina LLC owns and operates an apartment building located at 503 S. Catalina Street, Los Angeles, CA 90020;

g.    Havenhurst Habitats LLC owns and operates apartment buildings located at 1253 Havenhurst Drive, West Hollywood, CA 90046 and 1316 Havenhurst Drive, West Hollywood, CA 90046.

h.    Hollywood Carlton Properties, LLC owns and operates apartment buildings located at 350 South Manhattan Place, Los Angeles, CA 90020, 314 South Manhattan Place, Los Angeles, CA 90020 and 147 North Hamilton Drive, Beverly Hills, CA 90211;

i.    Mehta Sisters LLC owns and operates apartment buildings located at 18424 Halsted Avenue, Northridge, CA 91325 and 18404 Vincennes Street, Northridge, CA 91325;

j.    Newhall Apartments LLC owns and operates an apartment building located at 10755 Kling Street, North Hollywood, CA 91602;

k.    NVS Properties LLC owns and operates an apartment building located at 6565 Sabado Tarde Rd., Goleta, CA 93117.

l.    Parallax Properties LLC owns and operates apartment buildings located at 18407 Dearborn Street, Northridge, CA 91325, 311 S. New Hampshire Avenue, Los Angeles, CA 90020 and 226 South Serrano Los Angeles, CA 90004;

m.    Piedmont Villas LLC owns and operates an apartment building located at 1945 Glendon Avenue, Los Angeles, CA 90025;

n.    Pluto Investment Properties LLC owns and operates an apartment building located at 2820 Sawtelle Boulevard, Los Angeles, CA 90064;

o.    Silver Point Properties LLC owns and operates apartment buildings located at 7044 Lanewood Avenue, Los Angeles, CA 90028, and 7056 Lanewood Avenue, Los Angeles, CA 90028;

p.    Streamline Properties LLC owns and operates an apartment building located at 1620 S. Bentley Avenue, Los Angeles, California 90025.

q.    Thames Properties LLC owns and operates an apartment building located at 944

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

5

Tiverton Avenue Los Angeles, CA 90024;

r.   Virgil Villas LLC owns and operates apartment buildings located at 315 South Virgil Avenue, Los Angeles, CA 90020 and 310 South Virgil Avenue, Los Angeles, CA 90020;

s.   VSN Properties LLC owns and operates an apartment building located at 1527 Veteran Avenue Los Angeles, CA 90024;

t.   Xenon Investment Corp. owns and operates apartment buildings located at: (i) 1031 N. Orange Grove Ave., West Hollywood, CA 90046; (ii) 4524 Vista Del Monte Ave., Sherman Oaks, CA 91403; (iii) 4648 Fulton Avenue, Sherman Oaks, CA 91423; (iv) 4636 Fulton Avenue, Sherman Oaks, CA 91423; (v) 1635 - 1639 North Martel Avenue, Los Angeles, CA 90046; (vi) 2201 South Beverly Glen Boulevard, Los Angeles, CA 90064; (vii) 2225 South Beverly Glen Boulevard, Los Angeles, CA 90064; and, (viii) 2245 South Beverly Glen Boulevard, Los Angeles, CA 90064.

u.   Other properties according to proof.

### D.   Does.

10.   Defendants Does 1 through 400, inclusive, are unknown to Plaintiffs who therefore sues said Defendants by such fictitious names and will ask leave of court to amend this complaint to show the true names and capacities, whether corporate, individual, partnership, association or otherwise when said names or capacities have been ascertained.

11.   Plaintiffs are informed and believe and based thereon allege that Does 1 through 400, inclusive, are in some way responsible for the injuries and damages sustained by Plaintiffs herein.

### E.   Defendants.

12.   The State of California and Does 1 through 10, inclusive, are governmental entities hereinafter collectively referred to as "the State."

13.   The County of Los Angeles and Does 11 through 20, inclusive, are governmental entities hereinafter collectively referred to as "the County."

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND
INJUNCTIVE RELIEF
6

14.    The City of Los Angeles and Does 21 through 30, inclusive, are governmental entities hereinafter collectively referred to as "the City of L.A."

15.    The City of West Hollywood and Does 31 through 40, inclusive, are governmental entities hereinafter collectively referred to as "West Hollywood."

16.    The City of Beverly Hills and Does 41 through 50, inclusive, are governmental entities hereinafter collectively referred to as "Beverly Hills."

17.    The City of Goleta and Does 51 through 60, inclusive, are governmental entities hereinafter collectively referred to as "Goleta."

18.    The City of Oxnard and Does 61 through 70, inclusive, are governmental entities hereinafter collectively referred to as "Oxnard."

19.    The County of Ventura and Does 71 through 80, inclusive, are governmental entities hereinafter collectively referred to as "Ventura."

20.    The County of Santa Barbara and Does 81 through 90, inclusive, are governmental entities hereinafter collectively referred to as "Santa Barbara."

### F.    Agency, Conspiracy, and Aiding and Abetting.

21.    Plaintiffs are informed and believes and based thereon alleges: (1) that at all times mentioned herein certain Defendants were the agents, principals, partners, associates, joint venturers, employees, co-conspirators of, and/or aiders and abettors of certain co-Defendants; (2) that certain Defendants were acting within the course, purpose and scope of said agency, partnership, association, joint venture, employment, conspiracy and/or relationship of aider and abettor; and, (3) that certain Defendants were acting within the authorization, permission and consent of certain co-Defendants.

### G.    Chronology.

22.    On **March 15, 2020**, Mayor Garcetti issued an imbalanced Public Order under the City's Emergency Authority entitled "New City Measures to Address COVID-19," which, among other things, provided:

a.    That "no landlord shall evict a residential tenant in the City if the tenant is able to show

an inability to pay rent due to 'circumstances' related to the COVID-19 pandemic." Such "circumstances" include "loss of income due to a COVID-19 related workplace closure, child care expenditures due to school closures, health care expenses related to being ill with COVID-19 or caring for a member of the tenant's household who is ill with COVID-19, or reasonable expenditures that stem from government-ordered emergency measures."

b.    That tenants were not required to support with documentation their claims of an inability to pay rent due to COVID-19.

c.    The landlords'/owners property owners' rights to continue collecting rent from such residential tenants.

23.    On **March 16, 2020**, in another imbalanced order, Governor Newsom issued Executive Order No. N-28-20, which, among other things, nullified provisions of state law that would "preempt or otherwise restrict a local government's exercise of its police power to impose substantive limits on residential or commercial evictions."

24.    On **March 16, 2020**, the City of West Hollywood issued Ordinance No. 20-1110U, thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

25.    On **March 17, 2020**, the City of Burbank issued Ordinance No. 20-3,934, and related orders thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

26.    On **March 17, 2020**, the City of Beverly Hills issued Ordinance No. 20-O-2805, thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

27.    On **March 18, 2020**, the City of Santa Monica issued "First Supplement to Executive Order of the Director of Emergency Services," thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

28.    On **March 18, 2020**, the City of Glendale issued an "Order of Director of Emergency

Services," thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

29.     On **March 19, 2020**, Governor Newsom's imposed Executive Order No. N-33-20, which, among other things, mandated that "all individuals" were required to "stay home or at their place of residence…"

30.     On **March 19, 2020**, the Board of Supervisors for the County of Los Angeles ratified an Order "Following Proclamation of Existence of a Local Health Emergency", thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

31.     On **March 20, 2020**, the City of Agoura Hills issued Executive Order 2020-0, thereby cutting back on the rights of lessors, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

32.     On **March 27, 2020**, Governor Newsom issued Executive Order No. N-37-20, restricting evictions though May 31, 2020. *Said order extended a tenant's deadline to respond to an unlawful detainer complaint by 60 days, and prohibited a landlord from enforcing an eviction judgment, if certain conditions related to Covid-19 were met by the tenant.* This law was unconstitutional, facially and as-applied, and constituted a taking.

33.     On **March 27, 2020**, Governor Newsom issued Executive Order N-66-20 which extended the eviction moratorium for an additional 60 days to July 29, 2020 and related orders. This law was unconstitutional, facially and as-applied, and constituted a taking.

34.     On **March 27, 2020**, the City of LA enacted Ordinance No. 186585 ("**City LA-Eviction Moratorium**") (signed on March 31 by Mayor Garcetti) mandating a "temporary" moratorium on evictions for non-payment of rent for tenants unable to pay rent due to circumstances related to the Pandemic. It contained the following **imbalanced** provisions and features:

   a.     Said Eviction Moratorium claimed it would only be in effect "temporarily," but the use of the word "temporary" was and is misleading because: (1) It severely understated the time it would be in effect; and, (2) It had no specific expiration date, as it extended tenants' protections an additional 12-months beyond the "end of the local emergency."

b.  Said Eviction Moratorium broadly and retroactively applied to "non-payment eviction notices, no-fault eviction notices, and unlawful detainer actions based on such notices, served or filed on or after March 4, 2020."

c.  *It prohibited landlords/property owners from terminating tenancies based on a number of grounds, including those that had nothing to do with Covid-19;*

d.  Said Eviction Moratorium prohibited landlords from terminating tenancies based on reasons that are **not** related to COVID-19 or the Pandemic, including but not limited to: (1) any "no fault" reason for termination; (2) certain lease violations related to unauthorized occupants, unauthorized pets, and nuisance; (3) altering protections to the landlords under the Ellis Act, whereby landlords are prohibited from removing occupied units from the rental market as would otherwise be allowed by the Ellis Act until 60-days after the end of the Local Emergency period; and, (4) Other prohibitions according to proof.

e.  Said Eviction Moratorium expressly provided that a tenant could affirmatively defend an unlawful detainer by claiming inability to pay due to the Pandemic.

f.  Said Eviction Moratorium allowed for an extended repayment schedule – allowing tenants up to 12-months after the end of the Local Emergency to repay the delayed rent, without any interest or late penalties having accrued.

g.  Said Eviction Moratorium prohibited an owner from charging interest or a late fee on rent that has not been paid as a result of reasons other than those legitimately related to COVID-19.

h.  Said Eviction Moratorium provided that tenants "may" agree to a repayment plan, they do not require them to do so.

i.  Said Eviction Moratorium allowed a tenant, who has failed to pay rent during the emergency period, to refuse to repay *any* of that back rent for another full year after the emergency order is lifted.

j.  Said Eviction Moratorium prohibited a landlord from legally pursuing the tenant until a full year after the emergency order is lifted.

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

10

k.   Said Eviction Moratorium required landlords and property owners to continue paying for the tenants' utilities, and to continue maintaining secure and habitable living units pursuant to the terms of the leases.

l.   *It effectively prohibited landlords from withdrawing premises from the market notwithstanding their fundamental right to exclude certain individuals from their property.*

m.   With unprecedented imbalance, it failed to provide any protection to landlords and property owners who are unable to pay mortgages, taxes, utilities and operating expenses needed to provide safe and habitable units to their tenants, even when the inability of a landlord and property owner was due to Covid-related issues*;*

n.   While said Eviction Moratorium ostensibly protected tenants who were unable to pay rent due to circumstances related to the Pandemic, in reality, it arbitrarily shifted the financial burden onto property owners, many of whom were also suffering financial hardship as a result of the Pandemic.

o.   Said Eviction Moratorium conflicted with executive orders of the Governor which required tenants to provide supporting documentation. For example, it *prohibited evictions that were still available to landlords under the TRA, including, for example, evictions based on unauthorized occupants or pets.*

p.   Said Eviction Moratorium very unfairly failed landlords with a mechanism to challenge a tenant's claimed "inability to pay," effectively forcing property owners to accept such claims without question, and took away access to the court.

q.   *It did not require tenants to provide any evidence of Covid-related inability to pay rent, and/or to give the landlords notice before they stop paying, and hence it completely disables landlords from contesting a tenants' claim for protection due to a Pandemic-related inability to pay. In other words, the landlords are forced to simply take the tenants "word" for it.*

r.   Said Eviction Moratorium effectively eliminated all remedies available to property owners.

s.  With great imbalance, said Eviction Moratorium created a private right of action in favor of tenants only, whereby tenants are empowered to sue their landlords for violating same, i.e., a tenant may bring an action for civil penalties of up to $10,000 per violation (plus up to an additional $5,000 if the tenant is senior citizen or disabled).  The private right of action applied from May 12, 2020 forward.  Thus, while landlords were stripped of all remedies and access to court or any other tribunal, tenants are free to go to court to assert monetary claims against their landlords.

t.  *It subjects landlords to penalties and administrative citations if they exercise their right under the unlawful detainer statutes of the State of California.*

u.  *As to said Eviction Moratorium, the bottom line reality was it forced landlords to serve the public's need for housing without payment for rent. Landlords are effectively compelled to give tenants interest-fee loans without any realistic chance of collection in the future.*

v.  Other imbalanced and illegal provisions according to proof.

35.  The City LA-Eviction Moratorium and the County's moratorium conflicted with orders of the State, and imposed harsher restrictions of landlords.  *The 3 sets of orders  overlapped, and were impossible to harmonize.*   For example, Governor Newsom's eviction-related Executive Orders required tenants to "retain verifiable documentation" to support a "substantial decrease in household or business income related to COVID-19," and stated that the orders would "*shall (not) prevent a tenant who is able to pay all or some of the rent due from paying that rent in a timely manner or relieve a tenant of liability for unpaid rent.*"  However, the order of the City of LA, and the County of LA allowed all tenants (even ones not impacted by the Pandemic) to avoid paying rent.

36.  On or about **March 31, 2020**, the County of Los Angeles ratified a Resolution "Amending the Executive Order for an Eviction Moratorium" which cut back on the rights of all Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

37.  The various versions of the Government Orders promulgated by the various governmental entities dramatically conflicted with, and were inconsistent with, one another, leaving

Plaintiffs, property managers, legal experts and even judges stumped in their interpretations. For example: Did the State's Government Orders trump the County's Government Orders, or did the County's Government Orders trump Government Orders of Cities within the County or vice versa? As many of the Government Orders  contained provisions that would impose significant legal penalties on landlords who sought to evict non-rent-paying tenants, landlords, like all Plaintiffs herein, were faced with uncertainty and were concerned about those profound legal penalties.

38.     Plaintiffs began to receive Covid Notices from various non-rent-paying-tenants, but not all non-rent-paying-tenants, to the effect that they were being impacted by Covid, thereby paralyzing Plaintiffs from pursuing any remedies as to these non-rent-paying tenants who submitted Covid Notices. As to tenants who stopped paying rent, but did not submit Covid Notices, due to the massive uncertainties of, and ambiguities in the Government Orders, Plaintiffs did not pursue evictions out of fear that they would be severely penalized per the Government Orders.  Nevertheless, Plaintiff did everything within reason to mitigate damages. However, certain governmental entities, such as the City of Los Angeles, in order to punish Plaintiffs for filing this action, actually increased assessments and government fees. Without any support and only interference from Defendants, Plaintiffs' rent revenues dramatically decreased while their costs of maintaining the properties increased.

39.     On **April 6, 2020**, the City of West Hollywood issued Ordinance No. 20-1103U which cut back on the rights of certain Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

40.     On **April 14, 2020**, the County of Los Angeles issued an Order "expanding tenant protections," and related orders which cut back on the rights of Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

41.     On **May 4, 2020**, the City of West Hollywood enacted Ordinance No. 20-1105U  which cut back on the rights of certain Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

42.     On **May 6, 2020**, the City of Los Angeles extended the Rent Freeze Ordinance to ***one year*** after the expiration of the Local Emergency period.

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

43.    On **May 6, 2020**, the City of Los Angeles continued to violate the rights of landlords and lessors, including certain Plaintiffs. More specifically, although numerous government relief programs were in place to assist tenants in meeting their obligations to pay rent, the City of LA "updated" its Eviction Moratorium by enacting Ordinance No. 186606. Among other things, the update prohibited landlords from influencing or attempting to influence, "through fraud, intimidation or coercion, a residential tenant to transfer or pay to the Owner any sum received by the tenant as part of any government relief program."

44.    While the Eviction Moratorium originally provided that such protections would only be in effect through May 31, 2020, on **May 29, 2020**, by Executive Order No. N-66-20, the State extended tenant protections through the end of July 2020.

45.    Due to uncertainties of, lack of clarity of, and inconsistencies within and between the Government Orders, Plaintiffs continued to receive Covid Notices from many non-rent-paying tenants, thereby prohibiting Plaintiffs from protecting themselves legally, including, pursuing evictions. As to non-rent-paying tenants who did not submit Covid Notices, notwithstanding their best efforts, Plaintiffs continued to drown in the uncertainty created by the convoluted, confusing and often inconsistent, Government Orders. Plaintiffs' rent revenues continued to plummet, while the costs of operating the complexes increased.

46.    On **June 3, 2020**, the County issued a Resolution "Restating the Executive Order for an Eviction Moratorium," which cut back on the rights of Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

47.    On **June 15, 2020**, the City of West Hollywood enacted Ordinance No. 20-1108U which cut back on the rights of certain Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

48.    In **mid-June 2020**, the City of LA promulgated a "Rent Relief Program" which caused further damage to landlords and lessors, including certain Plaintiffs. More specifically, in order to qualify for same, the City of LA required the applicant to prove that he or she had not been paying rent. *Accordingly, to Plaintiffs' profound detriment, said City actually began encouraging tenants not to pay rent.*

49.     Due to contradictory provisions of Government Orders of the City (CEM) and the State, landlords were required to somehow comply with conflicting requirements thereof. For example, a landlord complying with the TRA's complicated process for demanding unpaid rent may concurrently be in violation of the CEM's prohibition on "endeavor[ing] to evict a tenant," including serving any "notice to pay or quit." (Sec. 49.99.1(B).)  A landlord complying with the TRA may also be subjected to penalties and/or litigation from a tenant per the CEM. (Sec. 49.99.7, Sec. 49.99.8.)

50.     The CEM is inconsistent with the TRA in other ways as well. For example, the CEM bars other evictions/attempted evictions that are not prohibited under the TRA, including those based on unauthorized occupants or pets or "for nuisance related to COVID-19." (Sec. 49.99.2(C).). As another example, unlike the TRA, the CEM prohibits landlords from charging interest or late fees on unpaid rent. (Id.) Thus, the combined impact of the CEM and the TRA is to essentially transform unpaid rent into unsecured debt without accrual of interest. Landlords are being forced to give their tenants interest free loans without any realistic and economically feasible chance of collection.

51.     On **June 19, 2020**, the City of Beverly Hills enacted Ordinance No. 20-O-2815  which cut back on the rights of certain Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

52.     On **June 23, 2020**, the County Board of Supervisors extended its eviction moratorium through July 31, 2020 and issued other orders which caused economic damage to Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

53.     On **June 30, 2020**, the City of Glendale enacted Resolution 20-92, which cut back on the rights of certain Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

54.     On **July 20, 2020**, the City of West Hollywood enacted Ordinance No. 20-1113U which cut back on the rights of certain Plaintiffs, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

55.     On **July 21, 2020**, the County Board of Supervisors enacted a Resolution "Restating the Executive Order for an Eviction Moratorium," which cut back on the rights of Plaintiffs, including the

right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

56.    On **July 31, 2020**, the County Board of Supervisors extended the Executive Order and resulting eviction moratorium through September 30, 2020 and issued other orders which caused economic damage to Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

57.    Due to uncertainties of, lack of clarity of, and inconsistencies within and between the Government Orders, Plaintiffs continued to receive Covid Notices from many non-rent-paying tenants, thereby prohibiting Plaintiffs from protecting themselves legally, including, pursuing evictions. As to non-rent-paying tenants who did not submit Covid Notices, notwithstanding their best efforts, Plaintiffs continued to drown in the uncertainty created by the convoluted, confusing and often inconsistent, Government Orders. Plaintiffs continued to lose substantial amounts of revenues, and remained unable to evict and/or to enforce their rights.

58.    On **August 31, 2020**, Governor Newsom signed AB 3088, which cut back on the rights of Plaintiffs, including the right and ability to evict for nonpayment. This became known as the Covid-19 Tenant Relief Act of 2020 (**TRA**). The TRA included the following features:

    a.    It did not expressly preempt most aspects of existing local ordinances, including the City LA-Rent Eviction Moratorium;

    b.    It established protections against evictions for tenants with Covid-19 related hardships, but in effect it simply allows a large volume of tenants not impacted by the Pandemic to exploit the situation to Plaintiffs' damage; and,

    c.    Originally, it was set to expire on January 31, 2021, but the period was extended to the end of Sept. 2021, and was extended through the Spring of 2022, or other specific date according to proof.

59.    On August 31, 2020, the California Legislature adopted the COVID-19 Tenant Relief Act ("**TRA**") codified at CC section 1179.01 to 1179.07. The TRA imposed a statewide moratorium on certain evictions.  Under the TRA, tenants who sign a declaration stating that they are unable to pay their rent due to COVID-19-related financial distress may not be evicted for failure to pay rent due

between March 1, 2020 and August 31, 2020. (C.C. § 789.4(a).) Further, tenants who sign a similar declaration cannot be evicted for failure to pay any rent due between September 1, 2020 and January 31, 2021, as long as they pay 25% of such rent no later than January 31, 2021. (C.C. § 1179.03(c)(4).)

60.     The unlawful detainer statutes allow landlords to serve a three-day notice to pay or quit when a tenant defaults on rent (C.C. § 1161(2)). However, the TRA provides any such notice seeking COVID-19 rental debt must specify a period no shorter than "15 days, excluding Saturdays, Sundays, and other judicial holidays" for the tenant to pay the amount due or deliver possession of the property. (C.C. § 1179.03(b)(1).) In addition, in the notice, the landlords were required to advise the tenant of his/her rights under the TRA, and include a specific notice from the State and an unsigned copy of the declaration necessary to obtain protection from eviction. (C.C. § 1179.03(b)-(e).)

61.     As of the **end of August 2020**, as a direct result of the Government Orders:

a.      Plaintiffs' revenues continued to plummet;

b.      Plaintiffs did not receive any money from any government source;

c.      Plaintiffs continued to be denied access to the courts;

d.      Plaintiffs received no compensation whatsoever as a result of the takings;

e.      Plaintiffs continued to be required to maintain the apartment buildings and to continue to maintain their habitability;

f.      Plaintiffs continued to be required to service mortgages;

g.      Plaintiffs continued to be required to furnish insurance;

h.      Plaintiffs continued to be required to spend funds on the property;

i.      Plaintiffs lost the ability to refinance at favorable rates;

j.      Plaintiffs lost the ability to develop;

k.      Plaintiffs were required to shoulder other significant burdens.

62.     On **October 13, 2020**, the County extended the Executive Order and resulting eviction moratorium through November 30, 2020 and issued other orders which caused economic damage to Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

63.     Due to uncertainties of, lack of clarity of, and inconsistencies within and between the

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

17

Government Orders, Plaintiffs continued to receive Covid Notices from many non-rent-paying tenants, thereby prohibiting Plaintiffs from protecting themselves legally, including, pursuing evictions. As to non-rent-paying tenants who did not submit Covid Notices, notwithstanding their best efforts, Plaintiffs continued to drown in the uncertainty created by the convoluted, confusing and often inconsistent, Government Orders. Plaintiffs continued to lose substantial amounts of revenues, and remained unable to evict and/or to enforce their rights.

64.    On **November 10, 2020**, the County extended the Executive Order and resulting eviction moratorium through January 5, 2021 and issued other orders which caused economic damage to Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

65.    On various dates according to proof in 2020, the City of Goleta, the City of Oxnard, the County of Ventura and the County of Santa Barbara instituted similar Governmental Orders substantially curtailing Plaintiffs' rights and imposing unfair burdens on them. )Hereinafter, all eviction Moratoria and all related edicts, orders, statutes, ordinances, regulations, etc., will be referred to, together as "Government Orders."

66.    As of the **end of the 2020**, as a direct result of the Government Orders:

a.    Plaintiffs' revenues continued to plummet

b.    Plaintiffs did not receive any money from any government source;

c.    Plaintiffs continued to be denied access to the courts;

d.    Plaintiffs received no compensation whatsoever as a result of the takings;

e.    Plaintiffs continued to be required to maintain the apartment buildings and to continue to maintain their habitability;

f.    Plaintiffs continued to be required to service mortgages;

g.    Plaintiffs continued to be required to furnish insurance;

h.    Plaintiffs continued to be required to spend funds on the property;

i.    Plaintiffs were required to shoulder other significant burdens.

67.    On **January 5, 2021**, the County extended the Executive Order and resulting eviction moratorium through February 23, 2021 and issued other orders which caused economic damage to

Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

68.     Due to uncertainties of, lack of clarity of, and inconsistencies within and between the Government Orders, Plaintiffs continued to receive Covid Notices from many non-rent-paying tenants, thereby prohibiting Plaintiffs from protecting themselves legally, including, pursuing evictions. As to non-rent-paying tenants who did not submit Covid Notices, notwithstanding their best efforts, Plaintiffs continued to drown in the uncertainty created by the convoluted, confusing and often inconsistent, Government Orders. Plaintiffs continued to lose substantial amounts of revenues, and remained unable to evict and/or to enforce their rights.

69.     On **February 23, 2021**, the County Board of Supervisors extended the Executive Order and resulting eviction moratorium through June 30, 2021 and issued other orders which caused economic damage to Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

70.     On **June 22, 2021**, the County extended the Executive Order and resulting eviction moratorium through September 30, 2021 and issued other orders which caused economic damage to Plaintiffs and cut back on their rights, including the right and ability to evict for nonpayment. This law was unconstitutional, facially and as-applied, and constituted a taking.

71.     On **June 28, 2021**, Assembly Bill 832 was approved by Governor Newsom and filed with the Secretary of the State whereby the eviction moratorium was effectively extended to September 30, 2021. This law was unconstitutional, facially and as-applied, and constituted a taking.

72.     On various dates according to proof in 2021, the City of Goleta, the City of Oxnard, the County of Ventura and the County of Santa Barbara instituted similar Governmental Orders substantially, or remained in effect, curtailing Plaintiffs' rights and imposing unfair burdens on them.

73.     In 2022, various Government Orders continued to negatively impact Plaintiffs.

74.     As of the **end of 2022**, as a direct result of the Government Orders:

a.     Plaintiffs' revenues continued to plummet;

b.     Plaintiffs did not receive any money from any government source;

c.     Plaintiffs continued to be denied access to the courts;

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

19

d.      Plaintiffs received no compensation whatsoever as a result of the takings;

e.      Plaintiffs continued to be required to maintain the apartment buildings and to continue to maintain their habitability;

f.      Plaintiffs continued to be required to service mortgages;

g.      Plaintiffs continued to be required to furnish insurance;

h.      Plaintiffs continued to be required to spend funds on the property;

i.      Plaintiffs were required to shoulder other significant burdens.

75.     In 2023, various Government Orders continued to negatively impact Plaintiffs.

76.     As of the **end of 2023**, as a direct result of the Government Orders:

a.      Plaintiffs' revenues continued to plummet;

b.      Plaintiffs did not receive any money from any government source;

c.      Plaintiffs continued to be denied access to the courts;

d.      Plaintiffs received no compensation whatsoever as a result of the takings;

e.      Plaintiffs continued to be required to maintain the apartment buildings and to continue to maintain their habitability;

f.      Plaintiffs continued to be required to service mortgages;

g.      Plaintiffs continued to be required to furnish insurance;

h.      Plaintiffs continued to be required to spend funds on the property;

i.      Plaintiffs were required to shoulder other significant burdens.

77.     Various Government Orders continued to negatively impact Plaintiffs.

78.     **As of this filing**, as a direct result of the Government Orders:

a.      Plaintiffs' revenues continued to plummet;

b.      Plaintiffs did not receive any money from any government source;

c.      Plaintiffs continued to be denied access to the courts;

d.      Plaintiffs received no compensation whatsoever as a result of the takings;

e.      Plaintiffs continued to be required to maintain the apartment buildings and to continue to maintain their habitability;

f.      Plaintiffs continued to be required to service mortgages;

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND
INJUNCTIVE RELIEF
20

g.    Plaintiffs continued to be required to furnish insurance;

h.    Plaintiffs continued to be required to spend funds on the property;

i.    Plaintiffs were required to shoulder other significant burdens.

79.    Although "laws" have been enacted and "programs" have been established which purportedly will provide some relief to landlords. As of this filing, Plaintiffs received just of small fraction of funds from these programs, which are now **out-of-effect**.

80.    Plaintiffs unfortunately believe that the so-called Government Orders and Eviction Moratoria will remain in effect at least well into 2024, and that the following trends, directly linked to the Government Orders an Eviction Moratoria, will continue:

a.    Declining rent revenue, and other forms of economic lost;

b.    Inability to pursue eviction and other proper and legal remedies that would be available but for the Government Orders;

c.    Complete lack of reimbursement or subsidization from various government entities and agency notwithstanding their loud and clear public promises to do so;

d.    Other adverse impacts according to proof.

**H.    The fallacies and realities.**

81.    Under the totality of circumstances, the undeniable fallacies and realities of the impacts of the Government Orders on landlords and owners of residential property, including Plaintiffs, are as follows:

a.    *Fallacy:* The *false* premise behind the Government Orders, designed to shift the burden of the Pandemic onto landlords, without provision of compensations, just or otherwise, was as follows: (1) Dramatic action by the government entities was necessary; and, (2) Same would prevent huge numbers of Los Angeles residents from being removed from their housing due to Pandemic-related financial hardship.

*Reality:* While the financial resources available to tenants impacted by COVID-19 abound, landlords and property owners have no real remedies. Landlords and property owners, like Plaintiffs, are still responsible for paying mortgages, property taxes,

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

21

utilities, security, managers, government- imposed fees, employee salaries, and a host of other expenses needed to maintain and operate their rental properties.

b.    *Fallacy*: Plaintiffs' properties have not been "taken."

*Reality*: Plaintiffs' are the only sector of the economy or commerce that has been forced to shoulder the burden of Covid-19 without any legitimate chance of being reimbursed for what they have lost.

c.    *Fallacy*: The Government Orders did not deprive Plaintiffs of property.

*Reality*: Quite to the contrary, the Government Orders resulted in substantial economic losses and other adverse consequences to the Plaintiffs.

d.    *Fallacy*: The Government Orders did not constitute a taking of private property for public use without just compensation.

*Reality*: Quite to the contrary, the Governmental Orders did take private property without any compensation whatsoever.

e.    *Fallacy*: There was no physical taking.

*Reality*: There was a physical taking as follows: (1) The Government Orders forced Plaintiffs to physically allow people to occupy rental units without paying rent; (2) The Government Orders forced the Landlords to physically allow unauthorized persons and animals to occupy the units. (For example, tenants impacted by the pandemic could bring their horses to the unit, leaving the landlord without recourse.); (3) The Government Orders took away a landlords' right to physically remove such persons and animals, and took away their right of access to the courts; (4) The Government Orders forced the landlords to allow physical activities to occur at the premises.

f.    *Fallacy*: The Government Orders did not "go to far."

*Reality*: The Government Orders were completely unreasonable as they gave the tenants all the rights without accountability and effectively, while conversely taking away major rights of landlords. In addition, if a landlord violates one of the Government Orders, he/she/it is subject to fines and even imprisonment. If a tenant on the other hand violates one of the Government Orders, landlords such as Plaintiffs have no recourse. The

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

22

Government Orders, in reality, do not provide for reasonable compensation, and to the extent government officials and politicians claim and promise impacted landlords that they will be reasonably compensated, the words and promises are nothing but hollow fluff.

g.  *Fallacy*: The Government Orders did not deny Plaintiffs equal protection of the law.

*Reality*: Quite to the contrary, Plaintiffs were singled out as a category of commerce and industry as they were the only category forced to shoulder the burden of Covid-19.

h.  *Fallacy*: The Government Orders did not impair contractual obligations.

*Reality*: The Government Orders nullified key and central contractual obligations.

i.  *Fallacy*: The Governmental Orders, and the impairment of the rights of individual property owns, was justified in light of the public health crisis.

*Reality*: "Individual rights secured by the Constitution do not disappear during a public health crisis." Emergency does not create power.

j.  *Fallacy*: The landlords will receive compensation from certain government programs.

*Reality*: As detailed below, as of today, Plaintiffs have received some payments from any government agency, but the payments do not come close to reimbursing Plaintiffs for their significant damages and burdens they have been forced to endure.

k.  *Fallacy*: The Government Orders will go out of effect shortly.

*Reality*: Plaintiffs predict the Government Orders will remain in effect until the Spring of 2024 at the earliest.


I.  **Plaintiffs seek compensation and other orders.**

82.  Plaintiffs seek substantial redress for their injuries, loss and harm, which includes but is not limited to the following types of damage and hardship:

a.  As described in incorporated paragraphs and above, as a direct proximate result of the Constitutional violations of Defendants against whom this cause of action is asserted, as of this filing, Plaintiffs suffered actual economic losses far exceeding $10,000,000, or other amount according to proof.  These actual damages are **continuing and increasing.**

b.    Plaintiffs have lost, and will continue to lose rents;

c.    Undoubtedly, a significant percentage of the tenants who have not been paying rent will not pay back any or all of the arrearages;

d.    As to the arrearages, there will be substantial collection costs in the future;

e.    As to Plaintiffs who have mortgages, in order to mitigate, many have had to move money from other investments in order to service the mortgages as there has been no "mortgage moratorium" corresponding to the eviction moratorium. This has resulted in substantial losses;

f.    Historically, the cost of operating the apartments and other rental units has gone up every year, while income streams from the rentals have now plummeted;

g.    Insurance rates are going up dramatically, due in part to issues set into motion by COVID-19, making it even more difficult for Plaintiffs whose expenses are going up while their income streams are plummeting;

h.    While Plaintiffs are ordered to maintain the "habitability" of the premises, Plaintiffs are discouraged from evicting nuisance tenants out of concern that the tenants will claim Plaintiffs are violating the Government Orders and out of concern that the City will fine or penalize them or even pursue criminal prosecution;

i.    On one hand, Defendants have severely impacted Plaintiffs' rights and abilities to generate revenue. Yet, on the other, at least one of the Defendants, i.e., the City of Los Angeles, has increased administrative payment demands, and if payment is not timely received, Plaintiffs will be severely penalized monetarily. (What if Plaintiffs could not pay due to Covid-related issues?);

j.    "Redress" in the form of damages and compensation;

k.    Attorney fees and costs per various laws and doctrines, including but not limited to 42 USC Sections 1983 and 1988, the California's "private attorney general statute" codified at CCP Section 1021.8, and CCP Section 1036 (in any inverse condemnation proceeding plaintiff is entitled to reasonable costs, disbursements, expenses, expert fees, and attorney fees), and as otherwise allowed by law.

l.      Numerous other forms of economic losses and hardships, according to proof.

m.      For such other and further relief as the court deems just and proper.

**First Cause of Action – Inverse Condemnation/Uncompensated Physical Taking in Violation of The Fifth Amendment of The United States Constitution**

(By Plaintiffs against Defendants, except for Does 351 to 400.)

83.     Plaintiffs hereby incorporate paragraphs 1 through 82, inclusive, as though fully set forth herein.

84.     As a direct result of the implementation of said Government Orders, including Eviction Moratoria, tenants of Plaintiffs stopped paying rent. But due to the convoluted and ambiguous nature of the Government Orders, inconsistencies between them, the risk of substantial penalties, and even criminal ramifications, Plaintiffs were effectively legally paralyzed relative to pursuing evictions and other remedies.

85.     The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." The purpose of the Takings Clause is to "bar [] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole." (Lingle v. Chevron Corp. (2005) 544 U.S. 528, 537, quoting Armstrong v. United States (1960) 364 U.S. 40, 49.)

86.     "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." (Cedar Point Nursery v. Hassid (2021) 141 S. Ct. 2063, 2071.) As the Supreme Court recently reaffirmed, the government commits a physical taking when it either "formally condemn[s] property," "physically takes possession of property without acquiring title to it," or "when it occupies property." (*Ibid.*) "These sorts of physical appropriations constitute the clearest sort of taking, and [courts] assess them using a simple, *per se* rule: The government must pay for what it takes." (*Ibid.* [citations and quotation marks omitted].) This rule applies with equal vigor regardless of whether the government "appropriat[es] private property for itself or a third party." (*Ibid.*)

87.     The Supreme Court has also repeatedly reaffirmed that any "public benefit" derived

from a physical taking *is simply not relevant* to a court's takings analysis: "[O]ur cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal impact on the owner." (Loretto v. Teleprompter Manhattan CATV Corp. (1982) 458 U.S. 419, 435.)

88.    The Government Orders here fall squarely within the "physical occupation" line of cases the United States Supreme Court has consistently held to constitute *per se* categorical takings for which the government "must pay for what it takes." (Cedar Point Nursery, supra, 141 S. Ct. at p. 2071.) The Government Orders required that Plaintiffs continue furnishing their properties —indefinitely — to defaulting and nonpaying tenants. Plaintiffs have no effective ability to mitigate losses or oust those in default. By precluding Plaintiffs' historic right to institute unlawful detainer proceedings, Defendants have deprived Plaintiffs of the means to physically remove defaulting tenants from their properties. Defendants have thus stripped from Plaintiffs the fundamental right to exclude — a right that "is 'one of the most treasured' rights of property ownership." (*Id.* at p. 2072, quoting Loretto, supra, 458 U.S. at p. 435.) The Government Orders thus constitute "government-authorized physical invasions . . . requiring just compensation." (*Id.* at p. 2073.)

89.    While the landlord-tenant relationship has historically been the subject regulation, property owners have never been subject to regulations requiring persistent and indefinite occupation *by defaulting and nonpaying tenants*.

90.    Separate from the indefinite eviction prohibitions, the County Moratorium also forced Plaintiffs to accept unauthorized pets and family members into units, even where mutually the leases prohibit pets and additional occupants. Such provisions constitute a distinct and independent *per se* physical taking under Loretto, supra, 458 U.S. at pp. 434–36. It is irrelevant that unauthorized pets and family members may only be temporary occupants because, under the Takings Clause, "physical appropriation is a taking whether it is permanent or temporary." (Cedar Point Nursery, supra, 141 S. Ct. at p. 2074; *see also id.* at pp. 2074–75 [collecting cases].)

91.    In short, the Government Orders constitute the functional equivalent of the Defendants commandeering private property under the purported public purpose of providing housing to tenants affected by the fallout from COVID-19. The Government Orders and the enforcement thereof have

caused a physical taking of Plaintiffs' property without just compensation as required under the Takings Clause of the Fifth Amendment to the U.S. Constitution. This, in turn, has caused proximate and legal harm to Plaintiffs. Plaintiffs are entitled to, and affirmatively seek, "just compensation" for that which has been taken in violation of the Fifth Amendment to the United States Constitution. Plaintiffs affirmatively assert that the defendants against whom this cause of action is asserted are jointly and severally liable for the harm Plaintiffs have sustained as a result of the overlapping Government Orders.

92. Prior to the promulgation of the Government Orders:

a. Plaintiffs enjoyed substantial incoming rent revenues;

b. In the event a tenant failed to pay rent or violated other provisions of his/her/its lease, Plaintiff could evict and had access to the courts;

c. Plaintiffs could freely develop and improve their properties;

d. Plaintiffs were not faced with substantial penalties for exercising rights of ownership of their properties;

e. Plaintiffs could reasonably control their expenses and costs of maintaining their properties; and,

f. Plaintiffs were not subject to substantial increases in assessments and government fees, such as the substantially enhanced fee vindictively imposed in 2022 by the City of Los Angeles relative to "Rent Stabilization Ordinance (**RSO**) and Systemic Code Enforcement Program (**SCET**)." (Although the City of Los Angeles Government Orders severely damaged Plaintiffs and caused them to lose huge amounts of revenues, vindictively, for the first time since approximately 2005, the City of Los Angeles substantially increased the fee for RSO and SCET.

93. After implementation of, and as a direct result of the Government Orders, including Eviction Moratoria, the following occurred:

a. Many of Plaintiffs' tenants stopped paying rent.

b. Many of Plaintiffs' tenants submitted Covid Notices and stopped paying rent.

c.   Some of Plaintiffs' tenants stopped paying rent without submitting Covid Notices knowing that the landlords were effectively prohibited from pursuing evictions.

d.   Some of Plaintiffs' tenants stopped paying rent based upon direct invitations by the City of Los Angeles not to pay rent.

e.   Plaintiffs' ability to develop their properties was severely impaired.

f.   Plaintiffs suffered other severe economic consequences.

94.   As a direct result of the Government Orders including Eviction Moratoria and other conduct of Defendants against whom this cause of action in which this allegation is included specifically in the cause of action or by incorporation by reference, Plaintiffs sustained damage and actual injury, and/or will in the future sustain damages and actual injury as follows:

a.   Plaintiffs' properties have been taken without the provision of just compensation;

b.   Undoubtedly, a significant percentage of the tenants who have not been paying rent will not pay back the arrearages;

c.   There will be substantial collection costs in the future;

d.   As to Plaintiffs who have mortgages, many have had to move money from other investments to service the mortgages as there has been no "mortgage moratorium" corresponding to the eviction moratorium;

e.   Historically, the cost of operating the apartments and other rental units has gone up every year, while income streams from the rentals have now plummeted.

f.   Insurance rates are going up dramatically, due in part to issues set into motion by COVID-19, making it even more difficult for Plaintiffs whose expenses are going up while their income streams are plummeting.

g.   While Plaintiffs are ordered to maintain the "habitability" of the premises, Plaintiffs are discouraged from evicting nuisance tenants out of concern that the tenants will claim Plaintiffs are violating the Government Orders and out of concern that the City will fine or penalize them or even pursue criminal prosecution.

h.   Plaintiffs have lost the ability to further develop and improve the properties;

i.   Plaintiffs will be required to pay attorney fees and litigation costs as a direct result of the

Government Orders, which fees and expenses would not have been incurred but for the existence of the Government Orders.

j.      Other damages, detriment and impact according to proof.

95.    As described in incorporated paragraphs and above, as a direct proximate result of the Constitutional violations of Defendants against whom this cause of action is asserted, as of this filing, Plaintiffs suffered actual economic losses far exceeding $10,000,000, or other amount according to proof.  These actual damages are **continuing and increasing**.

96.    As a result of the conduct of defendants against whom this cause of action is asserted, Plaintiffs were required to engage the services of private counsel to vindicate their rights. Plaintiffs request attorney fees, litigation expenses, and litigation costs per various laws and doctrines including but not limited 42 USC sections 1983 and 1988, California's "private attorney general statute" codified at CCP section 1021.8, CCP section 1036 (in **any** inverse condemnation proceeding, Plaintiff is entitled to reasonable costs, disbursements, expenses, expert fees and attorney fees), and as otherwise allowed by law.

**Second Cause of Action – Inverse Condemnation/Uncompensated Regulatory Taking in Violation of the Fifth Amendment of the United States Constitution**

(By Plaintiffs against all Defendants except 351 through 400)

97.    Plaintiffs hereby incorporate paragraphs 1 through 82, inclusive, and 84 through 96, inclusive, though fully set forth herein.

98.    The Government Orders also constitute a regulatory taking under the test embodied in Penn Central Transp. Co. v. New York City (1978) 438 U.S. 104, 124.) To determine whether a  governmental action effects a taking under *Penn Central*, courts weigh (1) "the economic impact of the regulation;" (2) "the extent to which the regulation has interfered with distinct investment-  backed expectations;" and (3) "the 'character of the governmental action.'" (Lingle, supra, 544 U.S. at p. 537, quoting Penn Central, supra, 438 U.S. at p. 124.) This three-part inquiry is "essentially ad hoc," but "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." (Lingle, 544 U.S. at p. 540.)

99.    The Government Orders and the enforcement thereof caused takings of Plaintiffs'

properties without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution for various reasons, including but not limited to:

a.  The economic impacts of the Government Orders are severe and ruinous to Plaintiffs, who are contractually entitled to receive rent from tenants on a monthly basis and cannot long survive if tenants are permitted to continue occupying the properties rent-free for a sustained and indefinite period of time. Indeed, the tenants of all 3 groups of Plaintiffs are very much in arrears, and the arrearages grow daily, and undoubtedly will continue into the future.  Among other things, the Government Orders effectively prevent Plaintiffs from bringing unlawful detainer actions to replace nonpaying tenants with paying tenants, and/or otherwise protecting their rights.

b.  The Government Orders have undermined Plaintiffs' "reasonable investment-backed expectations." More precisely, Plaintiffs developed and/or purchased their properties with the "objectively reasonable" expectation that they would be able to charge rent for units and have legal recourse if tenants failed to pay rent when contractually due. In fact, Plaintiffs made these business investments against the backdrop of California's unlawful detainer statutory scheme which included measures designed to resolve disputes between owners and defaulting tenants in an orderly, efficient and expeditious manner.

c.  While theoretically, the Government Orders do provide that Plaintiffs will eventually be allowed to attempt to collect unpaid rents, as noted by several significant courts, the ability to actually recover such back rent from cash-strapped tenants is **illusory**, at best. In addition, the County's Government Orders bans Plaintiffs from recovering any interest or late fees on missed rent, thereby depriving Plaintiffs of the constitutional right to the time value of money, including interest. (See, for example, Fowler v. Geurin (9th Cir. 2018) 899 F.3d 1112, 1118–19 ["Because the right to daily interest is deeply ingrained in our common law tradition, this property interest is protected by the Takings Clause[.]"].)

d.  The "character of governmental action" is tantamount to a physical invasion of private property. (Lingle v. Chevron (2008) 544 U.S. 528, 537, quoting Armstrong v. United

<u>States</u> (1960) 364 U.S. 40, 49.) The Government Orders effectively require that Plaintiff allow their tenants to continue to occupy their properties free of charge and to remain in possession for the foreseeable future. Indeed, the courts recognize that a key factor is whether a government order or other conduct of a government entity results in a "physical invasion" of the private property. (See, for example, <u>Penn Central, supra</u>, 438 U.S. at p. 124 [noting that "[a] 'taking' may be more readily found when the interference with property can be characterized as a physical invasion by government"])

e.    As other courts have recognized in the context of the Pandemic itself or similar contexts, the Government Orders here, and those like them, are **unprecedented** and **extreme** by any measure. (See, e.g., <u>See</u> <u>Baptiste v. Kennealy</u>, No. 1:20-CV-11335-MLW, 490 F.Supp.3d 353, 384 (D. Mass. 2020) ["a reasonable landlord would not have anticipated . . . a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do"].)

f.    Finally, the Government Orders do not merely "adjust [] the benefits and burdens of economic life to promote the common good" (<u>Penn Central, supra</u>, 438 U.S. at p. 124), but instead effect a compensable taking.

g.    Various other reasons beyond the scope of this pleading.

100.    As a result, Defendants' violation of the Takings Clause of the Fifth Amendment proximately caused actual harm to Plaintiffs, as detailed above, including incorporated paragraphs.

101.    As a direct result of the Government Order, including the Eviction Moratoria, Plaintiffs are entitled to recover, and affirmatively seek, just compensation for that which has been taken from them as a result of the Government Orders of the entities against whom this cause of action is asserted. Plaintiffs affirmatively assert that Defendants against whom this cause of action is asserted are jointly and severally liable for the harm Plaintiffs sustained as a result of the overlapping Government Orders.

102.    As a result of the conduct of defendants against whom this cause of action is asserted, Plaintiffs were required to engage the services of private counsel to vindicate their rights. Plaintiffs request attorney fees, litigation expenses, and litigation costs per various laws and doctrines including but not limited 42 USC sections 1983 and 1988, California's "private attorney general statute" codified

at CCP section 1021.8, CCP section 1036 (in **any** inverse condemnation proceeding, Plaintiff is entitled to reasonable costs, disbursements, expenses, expert fees, attorney fees, etc.), and as otherwise allowed by law.

### Third Cause of Action – Inverse Condemnation/Uncompensated Physical and Regulatory Taking in Violation of the Fifth Amendment of the United States Constitution

(By Plaintiffs against all Defendants except Does 351 through 400.)

103.    Plaintiffs hereby incorporate paragraphs 1 through 82, inclusive, 84 through 96, inclusive, 98 through 102, inclusive though fully set forth herein.

104.    For the reasons alleged hereinabove, the Government Orders of the entities against whom this cause of action is asserted effected takings, including an uncompensated physical and regulatory takings, under the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

105.    The Government Orders and the enforcement thereof have caused and resulted in takings, including regulatory and physical takings, of Plaintiffs' properties without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution, and seek damages under 42 U.S.C. Sections 1983 et seq.

106.    As a direct result of the Government Order, including the Eviction Moratoria, Plaintiffs are entitled to recover, and affirmatively seek, just compensation for that which has been taken from them as a result of the Government Orders of the entities against whom this cause of action is asserted.

107.    Plaintiffs affirmatively assert that Defendants against whom this cause of action is asserted are jointly and severally liable for the harm Plaintiffs sustained as a result of the overlapping Government Orders.

108.    Plaintiffs accordingly seek compensation as described in incorporated paragraphs.

109.    As a result of the conduct of defendants against whom this cause of action is asserted, Plaintiffs were required to engage the services of private counsel to vindicate their rights. Plaintiffs request attorney fees, litigation expenses, and litigation costs per various laws and doctrines including but not limited 42 USC sections 1983 and 1988, California's "private attorney general statute" codified at CCP section 1021.8, CCP section 1036 (in **any** inverse condemnation proceeding, Plaintiff is entitled

1  to reasonable costs, disbursements, expenses, expert fees, attorney fees, etc.),and as otherwise allowed
2  by law.

3
4  **Fourth Cause of Action – Inverse Condemnation/Uncompensated Taking in Violation of Article I, Section 19 of the California Constitution**

5  (By Plaintiffs against all Defendants except Does 351 through 400.)

6  110.    Plaintiffs hereby incorporate paragraphs 1 through 82, inclusive,  84 through 96,
7  inclusive, 98 through 102, inclusive, 104 through 109, inclusive, as though fully set forth herein.

8  111.    Like the federal Takings Clause of the Fifth Amendment to the United States
9  Constitution, Article I, § 19 of the California Constitution proscribes the "taking or damaging" of
10  private property for public use unless "just compensation" has "first been paid to, or into court for, the
11  owner."

12  112.    Relative to regulatory taking claims, the Takings Clause embodied in Article I, Section
13  19 of the California Constitution has been interpreted in a similar manner to the Takings Clause
14  embodied in the Fifth Amendment to the United States Constitution. (See for example, San Remo Hotel
15  L.P. v. City and Cty. of San Francisco (2002) 27 Cal.4th 643, 672–79 [California Supreme Court
16  relying on physical and regulatory takings decisions interpreting federal takings claims to evaluate
17  takings claim asserted under California Constitution].)

18  113.    The Government Orders constitute a taking or damaging of private property without just
19  compensation in violation of Article I, Section 19 of the California Constitution, and accordingly,
20  Plaintiffs are entitled to payment of "just compensation" for the taking pursuant to Article I, Section 19
21  of the California Constitution.

22  114.    Defendants against whom this cause of action is asserted are jointly and severally liable
23  for the harm Plaintiffs sustained as a result of the overlapping Government Orders.

24  115.    As result of the conduct of defendants against whom this cause of action is asserted,
25  Plaintiffs were required to engage the services of private counsel to vindicate their rights. Plaintiffs
26  request attorney fees, litigation expenses, and litigation costs per various laws and doctrines including
27  but not limited 42 USC sections 1983 and 1988, California's "private attorney general statute" codified
28  at CCP section 1021.8, CCP section 1036 (in **any** inverse condemnation proceeding, Plaintiff is entitled

to reasonable costs, disbursements, expenses, expert fees and attorney fees), and as otherwise allowed by law.

### Fifth Cause of Action – Federal Statutory Claim (42 USC 1983)

(By Plaintiffs against all Defendants except Does 351 through 400.)

116.    Plaintiffs hereby incorporate paragraphs 1 through 82, inclusive, 84 through 96, inclusive, 98 through 102, inclusive, 104 through 109, inclusive, and 111 through 115, inclusive, as though fully set forth herein.

117.    At all relevant times, the Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." The purpose of the Takings Clause is to "bar [] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole." (Lingle v. Chevron Corp. (2005) 544 U.S. 528, 537, quoting Armstrong v. United States (1960) 364 U.S. 40, 49.)

118.    "If a local government takes private property without paying for it that government has violated the Fifth Amendment…" (Knick v. Township of Scott, Pennsylvania (2019) 139 S. Ct. 2162, 2170.) An arbitrary or irrational law may violate due process. (Easter Enterprise v Apfel (1998) 524 US 498, 539.)

119.    At all relevant times, the Fourteenth Amendment of the United States Constitution stated: "No state shall make or enforce any law…; nor shall any state deprive any person of life, liberty, or property, without due process of law; …"

120.    42 USC Section 1983 is the primary remedial statute for asserting federal civil rights claims against local public entities, officers and employees. At all relevant times, Section 1983 stated:

> "Every person who, under color of any statute, ordinance, regulation, custom or usage of any state or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, **shall** be liable to the party injured in an action at law, suit in equity, or other proper proceeding for **redress**."

121.    In <u>Venegas v County of Los Angeles</u> (2004) 32 Cal.4th 820, 829, the California Supreme Court held that cities and counties sued in their official capacity are "persons" for the purposes of section 1983.

122.    Defendants against whom this cause of action is asserted violated the Fifth Amendment, triggering section 1983 as follows:

a.    Defendants took Plaintiffs' property for public use without payment of just compensation.

b.    The Government Orders are arbitrary and irrational, facially and as applied, providing layer after layer of protection and immunity to non-paying tenants, yet at the same time providing no protection or rights to Plaintiffs.

c.    Defendants against whom this cause of action is asserted, violated the Fourteenth Amendment by depriving Plaintiffs of their property without due process of law.

d.    In engaging in the conduct described herein and in incorporated paragraphs, Defendants against whom this cause of action is asserted acted under color of law, depriving Plaintiffs of rights secured by the Constitution, and accordingly are liable for redress.

123.    Accordingly, as a proximate result of the conduct of Defendants against whom this cause of action is asserted, Plaintiffs suffered substantial and actual economic losses as more fully described in incorporated paragraphs.

124.    As a result of the conduct of defendants against whom this cause of action is asserted, Plaintiffs were required to engage the services of private counsel to vindicate their rights. Plaintiffs request attorney fees, litigation expenses, and litigation costs per various laws and doctrines including but not limited 42 USC sections 1983 and 1988, California's "private attorney general statute" codified at CCP section 1021.8, CCP section 1036 (in **any** inverse condemnation proceeding, Plaintiff is entitled to reasonable costs, disbursements, expenses, expert fees and attorney fees), and as otherwise allowed by law.

**Sixth Cause of Action – Federal and State Constitutional Claim (Impairment of Contracts)**

(By Plaintiffs against all Defendants except Does 351 through 400.)

COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

35

125.    Plaintiffs hereby incorporate paragraphs 1 through 82, inclusive, 84 through 96, inclusive, 104 through 109, inclusive, 111 through 115, inclusive, and 117 through 124, inclusive, as though fully set forth herein.

126.    At all relevant times, the following laws were in effect:

a.    "No State shall…pass any…Law *impairing* the Obligation of Contracts ("the Contracts Clause) (U.S. Constitution, Art. 1, Section 10.)

b.    The right of a party not to have a State, or political subdivision thereof, *impair* its obligations of contract is a right secured by the first article of the United States Constitution. A deprivation of that right may therefore give rise to a cause of action under (42 U.S.C.) Section 1983."  (So. Cal. Gas v. City of Santa Ana (9th Cir. 2003) 336 F.3d. 885, 887.)

c.    Any "ex post facto law or law *impairing* the obligation of contracts may not be passed." (Cal. Const., Art. I, Section 9)

127.    There is "renewed vigor" relative to challenges of laws impairing contractual rights. See for example Allied Structural Steel v. Spannaus (1978) 438 US 234, 235; Energy Reserves v. Kansas Power (1983) 459 US 400, 411; Heights Apartments LLC v. Walnut Trails (8th Cir. April 5, 2022) 2022 WL 1009466; Sveen v. Melin (2018) 138 S.Ct. 1815, 1821-1822; Melendez v. City of New York (2021) 16 Fd. 4th 992, 1033-1034; Roman Catholic Dioces v. Cuomo (2020) 141 Supreme Court 63, 67, 69; US Transit v. New Jersey (1977) 431 US 1, 21-23; and Cedar Point v Hassid (2021) 141 S.Ct. 2063, 2072.

128.    "The severity of the impairment measures the height of the hurdle the state legislation must clear. (Allied Structural Steel v. Spannaus (1978) 438 U.S. 234, 245.) The "threshold inquiry" is whether the law substantially impairs an existing contractual relationship. (Energy Reserves v. Kansas Power (1983) 459 U.S. 400, 411.) The law need not result in the total destruction of contractual expectations in order to constitute a "substantial impairment." (Id.)  "While complete destruction of the rights of a contracting party is not required to find an impermissible impairment, the degree of contractual interference is critically significant to the constitutional analysis." (Ross v. City of Berkeley (N.D. Cal. 1987) 655 F. Supp. 820, 827.)

129.    In determining whether a law 'substantially impairs" existing contracts, courts are to consider the extent to which the contractual relationship historically has been subject to the same type of regulation in the past. (Id.)  Only past regulations on the same specific subject matter are relevant. (See for example Veix v. Sixth Ward (1940) 310 U.S. 32, 38 ["When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further regulation on the same topic."])

130.    In addition, the United States Supreme Court has recently re-confirmed that ownership of property subject to a lease involves a number of incidents and rights, including the right to receive rent and to exclude others (Alabama Association of Realtors, at 2485, 2489) and the right to exclude is fundamental and inherent in the ownership of property and is one of the most essential sticks in the bundle of rights commonly characterized as property. (Cedar Point, supra, at 2072.). Here, the impairments and negative impacts created by the Government Orders:

    a.    The Government Orders could not have been more severe and were **extraordinarily** one-sided;

    b.    The Government Orders completely interfered with and undermined the contractual bargains, and this will continue into the future;

    c.    The Government Orders interfered with the parties reasonable expectations and prevented Plaintiffs from safeguarding or reinstating their rights, especially since ownership of property subject to a lease involves a number of incidents and rights including the right to receive rent and the right to exclude others. This interference will continue into the future.

    d.    The Government Orders effectively prohibited all evictions, rather than those logically related to pandemic hardships. This interference will continue.

    e.    The Government Orders were not reasonably tailored because they imposed broad restrictions requiring landlords to house tenants engaging in material breaches of the lease, including those which undermined efforts to combat the virus, that had nothing to do with the nonpayment of rent. This interference will continue.

f.     Here, there is no evidence before the Court that when Plaintiffs entered into the impaired contracts that they acknowledged the future promulgation of extraordinarily one-sided eviction moratoria.  In fact, in the past, the contractual relationships between Plaintiffs and their tenants had never been subject to anything remotely similar to the Government Orders.

g.     The Government Orders have caused actual damage and other negative impacts according to proof, and this will be the case into the future.

131.   Historically, emergency moratoria assessed by the U.S. Supreme Court which appropriately and reasonably protect both parties to the contract have typically survived constitutional challenges, while laws impairing only one side of the contract without reasonable protection have been typically found to be **unconstitutional**. In order to withstand constitutional scrutiny, a moratorium must be reasonable as to both contracting parties. Here, the tenants have received beyond reasonable protections, while the landlords have no protection whatsoever. The Government Orders are not even-handed whatsoever. The concept that the landlords can file a lawsuit sometime in the future against the non-paying tenant for substantial funds and that the tenant of the residential unit will be able to pay the lump sum, frankly, is absurd, and as noted by the Court in <u>Melendez</u>, supra, is **speculative**. (<u>Melendez</u> at 1033-1034.)

132.   Accordingly, by enacting laws severely impairing Plaintiffs' rights under their contracts with tenants and by enacting imbalance Government Orders, the defendants against whom this cause of action is asserted illegally impaired contracts in violation of the laws of the United States and the State of California.

133.   Accordingly, as a proximate result of the conduct of Defendants against whom this cause of action is asserted which impaired Plaintiffs rights under their contracts with their tenants, Plaintiffs suffered substantial and actual economic losses as more fully described in incorporated paragraphs.

134.   As a result of the conduct of defendants against whom this cause of action is asserted, Plaintiffs were required to engage the services of private counsel to vindicate their rights. Plaintiffs request attorney fees, litigation expenses, and litigation costs per various laws and doctrines including

but not limited 42 USC sections 1983 and 1988, California's "private attorney general statute" codified at CCP section 1021.8, CCP section 1036, and as otherwise allowed by law.

WHEREFORE, Plaintiffs pray for judgment as follows:

1.   For damages and compensation far in excess of $10,000,000 and continuing in an amount according to proof, and interest thereon.

2.   If actual damages are not awarded, for nominal damages.

3.    For an order awarding said Plaintiffs their costs and reasonable attorney fees incurred in this action under various statutes and laws, including Sections 1983 and 1988 of 42 USC, CCP Section 1021.8, and CCP section 1038.

4.   For costs.

5.   For such other and further relief as the court deems just and proper.

Date: January 16, 2024

Respectfully submitted,
BAY CITIES LAW GROUP, INC.

*Steven Zelig*

Steven Zelig,
Attorney for Plaintiffs


## **DEMAND FOR JURY TRIAL**

Plaintiffs request trial by jury.

Date: January 16, 2024

BAY CITIES LAW GROUP, INC.

*Steven Zelig*

Steven Zelig,
Attorney for Plaintiffs


COMPLAINT FOR DAMAGES, ATTORNEY FEES AND COSTS, DECLARATORY RELIEF AND INJUNCTIVE RELIEF
39